# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

BARBARA PIPER, as Executrix of the Estate of
MICHAEL PIPER, Deceased, on behalf of herself and
all others similarly situated,

$\qquad$ Plaintiff,

v.

BAYER CROPSCIENCE LP, BAYER
CROPSCIENCE, INC., CORTEVA INC., CARGILL
INCORPORATED, BASF CORPORATION,
SYNGENTA CORPORATION, WINFIELD
SOLUTIONS, LLC, UNIVAR SOLUTIONS, INC.,
FEDERATED CO-OPERATIVES LTD., CHS INC.,
NUTRIEN AG SOLUTIONS INC., GROWMARK
INC., SIMPLOT AB RETAIL SUB, INC., AND
TENKOZ INC.

$\qquad$ Defendants.

Docket No. 3:21-cv-21

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

JURISDICTION AND VENUE ............................................................................... 3

PARTIES ................................................................................................................. 3

   A. Plaintiff ........................................................................................................... 3

   B. The Manufacturer Defendants ........................................................................ 3

   C. The Wholesaler Defendants ........................................................................... 4

   D. The Retailer Defendants ................................................................................. 5

SUBSTANTIVE ALLEGATIONS .......................................................................... 6

TRADE AND COMMERCE ................................................................................. 14

THE RELEVANT MARKETS ............................................................................... 14

ANTITRUST IMPACT ......................................................................................... 14

ANTITRUST INJURY .......................................................................................... 15

CLASS ACTION ALLEGATIONS ....................................................................... 15

STANDING TO SEEK RELIEF ........................................................................... 17

EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT ..................... 18

CLAIMS FOR RELIEF ........................................................................................ 19

Count 1: Conspiracy to Restrain Trade in Violation of § 1 of the
Sherman Act (15 U.S.C. § 1) .............................................................................. 19

Count 2: Arizona Uniform State Antitrust Act .................................................... 22

Count 3: California Cartwright Act ...................................................................... 23

Count 4: Hawaii Antitrust Laws .......................................................................... 24

Count 5: Illinois Antitrust Act ............................................................................. 24

Count 6: Iowa Competition Law.......................................................................... 25

Count 7: Kansas Restraint of Trade Act .............................................................. 26

Count 8: Maine Monopoly & Profiteering Laws................................................. 26

Count 9: Maryland Antitrust Laws ...................................................................... 27

Count 10: Massachusetts Consumer Protection Laws ......................................... 28

Count 11: Michigan Antitrust Reform Act .......................................................... 28

Count 12: Minnesota Antitrust Law of 1971 .................................................................... 29

Count 13: Mississippi Antitrust Laws ............................................................................... 30

Count 14: Nebraska Junkin Act ......................................................................................... 30

Count 15: Nevada Unfair Trade Practices Act .................................................................. 31

Count 16: New Hampshire Consumer Protection Act ....................................................... 32

Count 17: New Mexico Antitrust Act ................................................................................ 32

Count 18: New York Donnelly Act .................................................................................... 33

Count 19: North Carolina Antitrust Laws .......................................................................... 34

Count 20: North Dakota Uniform State Antitrust Act ....................................................... 34

Count 21: Oregon Antitrust Law ....................................................................................... 35

Count 22: South Dakota Antitrust Laws ............................................................................ 36

Count 23: Tennessee Trade Practices Act .......................................................................... 36

Count 24: Utah Antitrust Act ............................................................................................. 37

Count 25: Vermont Consumer Protection Laws ................................................................ 38

Count 26: Wisconsin Trade Regulations ........................................................................... 38

PRAYER FOR RELIEF ...................................................................................................... 39

DEMAND FOR JURY TRIAL ........................................................................................... 40

Plaintiff Barbara Piper, as Executrix of the Estate of Michael Piper, complains upon knowledge as to herself and her own acts, and upon information and belief as to all other matters, against Defendants for their violations of law from at least January 1, 2014, through the date on which the effects of Defendants' unlawful conduct ceased ("Class Period") as follows:

## INTRODUCTION

1.      The market for "Crop Inputs"—seeds and crop protection chemicals such as fungicides, herbicides, and insecticides—used by American farmers, is one of the largest markets in the world with annual sales in excess of $65 billion.

2.      This market is dominated by four major manufacturers—Defendants Bayer CropScience Inc., Corteva Inc., Syngenta Corporation, and BASF Corporation (collectively, the "Manufacturer Defendants")—whose products reach the market through large wholesalers—Defendants Cargill Incorporated, Winfield Solutions, LLC, Univar Solutions, Inc. (the "Wholesaler Defendants")—that control the distribution of Crop Inputs to farmers as well as retailers, including Defendants CHS Inc., Nutrien Ag Solutions Inc., Growmark Inc., Simplot AB Retail Sub, Inc., Tenkoz Inc., and Federated Co-operatives Limited (the "Retailer Defendants").

3.      The existing distribution process maintains supracompetitive Crop Input prices by denying farmers accurate product information, including pricing information, which would allow them to make better-informed purchasing decisions. As a result, the average price American farmers pay for Crop Inputs is increasing at a rate that dramatically outpaces yields—for example, over the last 20 years, the price of seed corn rose 300%, while corn yields increased only 33% to 35%. This disparity is proving increasingly devastating to farmers, who are now the least profitable level of the American food supply chain and are drowning in hundreds of billions of dollars of operating debt that is forcing them into bankruptcy at a record pace.

1

4.     Recognizing these inefficiencies, several electronic Crop Input sales platforms launched between 2016 and 2017. These platforms aimed to provide a cheaper, more transparent way for farmers to buy Crop Inputs by selling products acquired from the Manufacturer Defendants directly to farmers, circumventing the opaque, convoluted distribution system. For example, Farmers Business Network ("FBN") and AgVend Inc., two leading electronic sales platforms, were extremely popular with farmers upon launch, and both successfully raised millions of dollars from leading venture capital firms to build out capacity to meet that demand.

5.     These new platforms threatened the Defendants' dominant market position and control over Crop Input pricing. As a result, rather than compete fairly with these new electronic platforms, Defendants conspired to block the platforms' access to Crop Inputs by engaging in a group boycott. The Manufacturer and Wholesaler Defendants repeatedly blocked FBN's access to Crop Inputs by agreeing amongst themselves not to sell FBN products, even though doing so would have opened a significant new sales channel for any individual wholesaler or manufacturer acting independently and in their unilateral best economic interest.

6.     When FBN attempted to circumvent this unlawful boycott by purchasing an established retailer with existing supply agreements, the Manufacturer Defendants canceled those contracts, starving FBN's platform out of business by ensuring that FBN could not acquire the Crop Inputs it needed to operate. Other platforms, including AgVend, faced a similar fate, as Defendants also refused to supply them with Crop Inputs.

7.     As a result of Defendants' misconduct, farmers remain trapped in an inefficient, opaque Crop Input market that eliminates their profits and destroys their livelihoods. Plaintiff and the Classes bring this antitrust suit to redress that misconduct and ensure that future generations of farmers do not suffer the same fate.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 & 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) & 26. This Court also has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000 and members of the Class are citizens of a different state than Defendants.

9.      Venue is proper in this District pursuant to Sections 4, 12, & 16 of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. § 1391(b), (c), and (d). One or more Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

## PARTIES

### A.  Plaintiff

10.     Barbara Piper is the Executrix of the Estate of Michael Piper, deceased. Barbara Piper is, and Michael Piper was, a citizen of the state of Illinois and resident of Jefferson County, Illinois. Michael Piper purchased Liberty Herbicide at supracompetitive prices from Gateway FS, Inc. Gateway FS, Inc. is a member-owner of the GROWMARK, Inc. cooperative.

### B.  The Manufacturer Defendants

11.     Bayer AG is a multinational pharmaceutical, chemical, and agriculture company. It organizes itself into four divisions, each with its own management and corporate organization. Legal entities within each division work together, follow a common strategy, and report up to the same level of management.

12.     Defendant Bayer CropScience Inc. is a wholly-owned subsidiary of Bayer AG headquartered in St. Louis, Missouri and incorporated in New York that develops, manufactures, and sells Crop Inputs in the United States.

13.     Defendant Bayer CropScience LP is a wholly-owned subsidiary of Bayer AG headquartered in Research Triangle Park, North Carolina, and is a crop science company that sells Crop Inputs in the United States.

14.     Bayer CropScience Inc. and Bayer CropScience LP both operate as part of the Bayer Group's Crop Science division.

15.     Defendant Corteva Inc. is a domestic corporation headquartered in Wilmington, Delaware, that develops, manufactures, and sells Crop Inputs in the United States.

16.     Defendant BASF Corporation is headquartered in Florham Park, New Jersey, and is the principal U.S.-based operating entity and largest subsidiary of BASF SE, a multinational pharmaceutical, seed, and chemical company. BASF develops, manufactures, and sells Crop Inputs in the United States.

17.     Defendant Syngenta Corporation is the main U.S.-based operating subsidiary of Syngenta AG, and is headquartered in Wilmington, Delaware. Syngenta develops, manufactures, and sells Crop Inputs in the United States.

**C.  The Wholesaler Defendants**

18.     Defendant Cargill, Inc. is a domestic corporation headquartered in Minnetonka, Minnesota. Cargill owns and operates a wholesaler AgResource Division, which distributes Crop Inputs to Cargill's retail network and to retailers. Cargill's AgResource Division maintains contracts with each of Bayer, Corteva, BASF, and Syngenta entitling it to purchase and distribute branded Crop Inputs and entitling it to special rebates.

19.     Defendant Winfield Solutions, LLC ("Winfield United") is a domestic corporation headquartered in Arden Hills, Minnesota and incorporated in Delaware. Winfield United is a Crop Input wholesaler. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta

4

authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Winfield United is also a major Crop Input retailer that operates as a cooperative owned by its members, which are 650 Crop Input retail businesses operating 2,800 retail locations throughout the United States and parts of Canada.

20.     Defendant Univar Solutions, Inc. is a Crop Input wholesaler. Univar maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Univar Solutions, Inc. is a domestic corporation headquartered in Illinois and incorporated in Delaware.

**D.  The Retailer Defendants**

21.     Defendant CHS Inc. is one of the largest crop input wholesalers in the United States. Like many large wholesalers, it also operates retail networks bearing the CHS brand around the country that sell Crop Inputs from brick and mortar stores. CHS Inc. is incorporated and headquartered in the state of Minnesota.

22.     CHS and the retail networks it operates maintain contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

23.     Defendant Nutrien Ag Solutions, Inc. is both a Crop Input wholesaler and the largest Crop Input retailer in the United States. It sells Crop Inputs to farmers throughout the country and maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Nutrien Ag Solutions, Inc. is incorporated in Delaware and has its principal place of business in Colorado.

24.     Defendant GROWMARK, Inc. d/b/a Farm Supply or FS, is a large Crop Input retailer headquartered in Illinois, with brick and mortar locations throughout the Midwestern

United States. Growmark is incorporated in Delaware. Growmark maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs, and entitling it to special rebates.

25.     Defendant Tenkoz Inc. is one of the largest Crop Input retailers in the United States. Tenkoz purchases and sells 25% of all crop protection chemicals sold in the United States annually through 550 retail locations and 70 wholesale locations around the country. Tenkoz is incorporated and headquartered in Georgia. Tenkoz maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

26.     Defendant Simplot AB Retail Sub, Inc. f/k/a Pinnacle Agriculture Distribution, Inc. is a large Crop Input wholesaler and retailer that operates 135 retail locations across 27 states. Simplot is headquartered and incorporated in Mississippi.  Simplot maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

27.     Defendant Federated Co-operatives Ltd. is a large Crop Input retailer. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Federated is under investigation by the Canadian Competition Bureau for engaging in coordinated anticompetitive practices designed to exclude competition in the Crop Input market.

## SUBSTANTIVE ALLEGATIONS

28.     Farmers in the United States are facing an existential crisis, with operating expenses skyrocketing while yields remain stagnant. For example, between 1995 and 2011, the cost of growing soybeans and corn—the two most planted field crops in the United States—increased by

325% and 291%, respectively, but yields for those same crops rose by only 18.9% and 29.7%, respectively. In a 2018 survey, a staggering 80% of farmers reported that their costs had only continued to increase. As a result, farmers cannot pay their outstanding operating debts—estimated at well over $400 billion in 2019—and the rate of farm bankruptcies has accelerated, with declared farm bankruptcies increasing by 24% from 2018 to 2019, the biggest yearly increase since the Great Recession.

29.     This steady cost increase is not attributable to escalating research and development expenditures, which have decreased considerably over the past several years. Rather, it is the result of massive, unjustifiable disparities in the prices farmers pay for Crop Inputs—the seeds and chemicals such as fertilizer, insecticide, and herbicide used to produce a crop—which can vary by as much as 60% within a single geographic region, and the supracompetitive prices paid by farmers as a result of Defendants' group boycott of electronic distribution platforms.

30.     For example, a survey conducted of farmers nationally showed that the price per gallon farmers paid for Bayer AG's popular herbicide Roundup PowerMAX varied by as much as 270% from between $31.08 per gallon to $11.23 per gallon, even though in each instance the famers acquired the same product. The same is true of seeds, with some farmers paying $21.87 more per acre for seeds than other farmers pay for the exact same product.

31.     These price disparities persist—and wreak financial havoc on America's farmers—by Defendants' design. The Crop Input market is structured, from top to bottom, to maximize opacity and deny farmers access to the objective pricing data and product information they need to make informed decisions about the Crop Inputs they buy. Farmers, through no fault of their own, are unwittingly paying more for Crop Inputs than they would in a truly competitive market. Farmers lack the objective information and data needed to gauge whether their investments are

worthwhile, as well as any ability to purchase Crop Inputs without paying unnecessary overhead to brick-and-mortar retailers.

32.     This opacity begins at the very top of the Crop Input market, where the Manufacturer Defendants who develop and produce between 75% and 90% of the most popular Crop Inputs closely guard their product prices.

33.     Then, to maintain that secrecy, Manufacturer Defendants allow only wholesalers, including the Wholesaler Defendants, retailers the manufacturers own or operate, and retailers such as the Retailer Defendants that are licensed "authorized retailers," to sell the Manufacturer Defendants' Crop Inputs.

34.     The contracts granting "authorized retailer" licenses contain strict confidentiality provisions that require authorized retailers to keep confidential the manufacturers' prices, as well as any incentives, rebates, and commissions offered by the manufacturers to their authorized retailers. Those contracts also require so-called "zone pricing," under which identical products are sold at different prices depending on a farmer's location, which must also be kept strictly confidential. Zone pricing reflects historical practice (first introduced by Defendant Bayer in the 1990s) rather than any legitimate justifications for disparate pricing.

35.     Manufacturers also use a tactic known as "seed relabeling" to capitalize on farmers' lack of objective performance data. Seed relabeling is the practice of taking seeds that have been on the market under a given brand name for some time and repackaging the seeds under a new brand name so that they can be sold at a new, higher price, even though the seeds are the same.

36.     Pricing is no more transparent at the retail level. To the contrary, wholesalers' contracts with authorized retailers also contain strict confidentiality provisions. Retailers cannot disclose the price paid to the wholesaler for its Crop Inputs *or* the price at which retailers sell those

Crop Inputs to other farmers. To further muddy the market waters, retailers sell Crop Inputs and related services (e.g., spraying or applying chemicals) in bundles, making it difficult—if not impossible—for farmers to discern the price they are being charged for any individual Crop Input or service.

37.     Recognizing the inefficiency of such an opaque Crop Input market, electronic Crop Input sales platforms began emerging by 2016 with the goal of modernizing the market by, among other things, providing farmers with transparent pricing and access to Crop Inputs direct from the Manufacturer Defendants, avoiding the opaque distribution system controlled by the Wholesaler and Retailer Defendants.

38.     At first, those efforts showed extraordinary promise, as farmers gravitated *en masse* toward these electronic platforms in search of better, fairer prices for Crop Inputs. For example, more than 12,000 farmers signed up for FBN's service that provides objective performance data on Crop Inputs, while 6,000 farmers signed up for FBN's electronic platform that was designed to sell Crop Inputs online.

39.     This success drew negative attention from the Defendant wholesalers and retailers, who recognized that these new entrants threatened their traditional role in the Crop Input market and, more importantly, threatened their profit margins. As a report published by CoBank, a cooperative partly owned by Crop Input retailers and a major lender to grain cooperatives, explained, "Despite relatively low sales, **e-commerce companies pose a threat to brick-and-mortar ag retailers** in two ways. First, any new competitor will erode sales and margins to some degree and second, e-commerce sites increase transparency for product prices." That price transparency would allow farmers to negotiate with Crop Input retailers, thus eating into their margins.

40.     Upon learning about FBN's entry into the market in 2016, CHS Inc. officials distributed a letter to farmers attempting to discourage them from using FBN, falsely claiming that, while an electronic platform like FBN would be able to offer the same products at cheaper prices, "FBN just does it with little overhead and without returning any profits to you the farmer, while lining the pockets of investors and big data companies like Google."

41.     CropLife America is a trade association that comprises major Crop Input manufacturers, wholesalers, and retailers. Its Board of Directors is chaired by an executive from one of the Manufacturer Defendants—currently BASF's Paul Rea, and previously Corteva's Suzanne Wasson. For the 2016 to 2019 term, CropLife's Board of Directors also included executives from Defendants Bayer, CHS, Growmark, Tenkoz, and Simplot. Although CropLife America's long-time CEO claims that "the work of our Board of Directors is imperative to making sure that farmers have access to crop protection technology today and in the future," there is not a single representative from farming groups on CropLife America's Board of Directors. Instead, the Board of Directors comprises exclusively representatives from large Crop Input manufacturers, distributors, and retailers, making it an ideal vehicle for collusion.

42.     CropLife America also operates CropLife Magazine, a trade publication that echoed CoBank's sentiments and wrote repeatedly about the danger electronic platforms posed to Crop Input retailers' business model. CropLife stated that it was "concerned that the retailer could be disintermediated—i.e., that electronic platforms would 'cut out the middle man'—**allowing growers to find product conveniently and at a lower market price**," and decried "the devil known as 'price transparency,'" commenting that "[g]rowers were not really as interested in buying and selling and storing product as they were in printing price lists off the Internet and waving them in their retailer's faces. Already low margins were about to race to the bottom."

10

43.     CropLife's PACE Advisory Council—a committee composed of the "heads of major ag retailers, market suppliers, equipment makers, and other agricultural analysts"—clearly identified the threat posed by electronic platforms to retailers and wholesalers at its 2017 annual meeting. CropLife's coverage of the event reported that "three letters . . . continually cropped up no matter what the topic of conversation happened to be – FBN (Farmers Business Network). To say that all things related to FBN and its business practices dominated much of the day-long event would be a gross understatement. Several members of the PACE Council described how **FBN had negatively affected their businesses during 2017 by cutting into their already slim margins on various products**."

44.     The Retailer Defendants and the Wholesaler Defendants knew that retention of their market positions and profit margins depended on the exclusion of electronic platforms from the market, so they conspired to cut off the platforms' product supply. To achieve this end, the Retailer and Wholesaler Defendants pressured the Manufacturer Defendants, which rely on the Retailer and Wholesaler Defendants to recommend and sell their products to farmers, to refuse to supply FBN.

45.     Bayer secretly formed an internal task force in 2016 specifically to study the long-term competitive impact of FBN's electronic platform.

46.     The Manufacturer Defendants complied with this demand and initiated a joint boycott of electronic platforms including FBN, the target of CropLife's report. As a result, when FBN reached out to the Manufacturer and Wholesaler Defendants for Crop Inputs, they all refused to supply FBN, offering only pretextual excuses for doing so. For example, Syngenta's Head of Crop Protection Sales in the United States learned that a small number of branded Crop Inputs had been sold on electronic platforms in violation of Defendants' boycott. He falsely claimed that

11

electronic platforms would deliver counterfeit products and that, "[w]hen online entities acquire products from sources other than authorized dealers or contracted distributors, you'd better question and be concerned about the quality."

47.    To ensure that this boycott was successful, Defendants imposed strict penalties on retailers who failed to fall in line. For example, in 2018, after learning that some retailers had sold product to FBN despite the boycott, Syngenta initiated an audit of its authorized retailers to identify and punish the retailers who had made those sales.

48.    Bayer, BASF, and Corteva similarly include mandatory language in their form contracts with authorized retailers that allows them to audit authorized retailers' books and records and perform on-site inspections at any time. Bayer, BASF, and Corteva used these provisions to ensure that electronic platforms could not secure branded Crop Inputs by buying from an authorized retailer.

49.    This backlash even extended to generic products (*i.e.* Crop Inputs that no longer retain patent protection). In a recent Forbes article, one CEO of a generic chemical products company stated it was waiting to supply to FBN because it was "wary of angering their existing sales channels [i.e., wholesalers and retailers]." That CEO confirmed that "[i]n an ideal world, if I could flip the switch and sell to these guys, I would do it in a heartbeat."

50.    FBN attempted to neutralize this boycott by purchasing Yorkton, a Canada-based retailer with decades-old supply agreements with Defendants Bayer, Syngenta, BASF, Corteva, and Winfield United. These agreements—if honored—would have provided FBN with Crop Input inventory to sell to American farmers. Instead, the Wholesaler and Retailer Defendants threatened to retaliate against the Manufacturer Defendants if they continued supplying Crop Inputs to Yorkton. Faced with threats of retaliation from wholesalers and retailers, the Manufacturer

12

Defendants agreed to boycott Yorkton and abruptly canceled their longstanding supply contracts within a few months of its March 2018 acquisition by FBN.

51.     This boycott was successful. FBN, starved of Crop Inputs, has begun developing its own products that it can sell to farmers via its electronic platform.

52.     Defendants' boycott was not limited to FBN. They also refused to supply AgVend. Lacking supply, AgVend shut down its platform in favor of establishing web-based storefronts for traditional brick-and-mortar retailers, essentially migrating the existing broken market structure online.

53.     As a result of the Retailer, Wholesaler, and Manufacturer Defendants' coordinated actions, farmers were deprived of the opportunity to purchase Crop Inputs at transparent, lower prices from electronic platforms. Instead, they were forced to continue paying artificially high prices for Crop Inputs purchased from local retailers subject to Defendants' confidentiality requirements.

54.     The downfall of FBN and AgVend drew the attention of Canada's Competition Bureau ("CCB"), which is formally investigating Defendants for collusion under Section 10 of the Competition Act Canada (R.S.C., 1985, c. C-34). The inquiry is focused on the conduct of Federated Co-operatives Limited, Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Corteva Inc. and/or its affiliates, and Bayer CropScience Inc. and its wholly-owned subsidiary Monsanto Canada ULC in the seed and crop protection markets. The CCB is investigating whether those entities engaged in practices reviewable under Part VIII of the Competition Act Canada.

55.     In the course of that investigation, on February 11, 2020, a Canadian federal court granted in full *ex parte* applications made by Canada's Commissioner of Competition for the

production of records against Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Bayer CropScience Inc. and its wholly-owned subsidiaries Monsanto Canada ULC and Production Agriscience Canada Company, Pioneer Hi-Bred Canada Company and Dow Agrisciences Canada Inc. relating to those practices.

56.     Critically, and over Defendants' objections, the Canadian federal court found sufficient evidence to require Defendants to produce records concerning their coordinated anticompetitive conduct in the United States as well. The United States Department of Justice is monitoring the Competition Bureau's investigation and is deciding whether to launch its own investigation into Defendants' concerted refusal to supply electronic platforms with Crop Inputs.

## TRADE AND COMMERCE

57.     The Defendants' business activities that are subject to this Complaint were within the flow of and substantially affected interstate trade and commerce.

58.     During the Class Period, the Defendants' conduct and their co-conspirators' conduct occurred in, affected, and foreseeably restrained interstate commerce of the United States.

## THE RELEVANT MARKETS

59.     This action involves the markets for Crop Inputs, including the manufacture of Crop Inputs, the wholesale market for Crop Inputs, and the retail sales market for Crop Inputs.

60.     The relevant geographic market is the United States.

## ANTITRUST IMPACT

61.     Defendants' conduct has substantially impaired competition in the retail sale market for Crop Inputs by excluding electronic platforms, including FBN and AgVend, from competing in that market.

14

62.     Defendants' conduct in boycotting and preventing electronic platforms from competing in the retail sales market for Crop Inputs lacks any procompetitive justification. Moreover, the harm to competition and the resulting antitrust injury—suffered by both farmers and other consumers of Crop Inputs—more than offsets any procompetitive justifications Defendants may offer.

## ANTITRUST INJURY

63.     Plaintiff and Class Members have suffered antitrust injury as a direct result of Defendants' unlawful conduct.

64.     By impairing competition in the retail sales market for Crop Inputs, and by excluding electronic platforms from competing in that market, Defendants have artificially raised the prices paid by farmers for Crop Inputs, and ultimately the prices paid by consumers for farm products including corn and grain.

## CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action on behalf of herself, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of:

>    **A.     All persons or entities residing in the United States that, during the Class Period, purchased from a Defendant a Crop Input manufactured by a Manufacturer Defendant; and**

>    **B.     All persons or entities residing in the United States that, during the Class Period, purchased from a retailer other than a Retailer Defendant a Crop Input manufactured by a Manufacturer Defendant.**

66.     Excluded from the Classes are Defendants; their officers, directors, management, employees, subsidiaries, affiliates, and coconspirators; and any persons or entities that purchased Crop Inputs solely for resale to others. Also excluded are the judge presiding over this action; her

law clerks and spouse; any persons within three degrees of relationship to those living in the Judge's household; and the spouses of all such persons.

67.     Members of the Classes are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Classes are readily identifiable from information and records in Defendants' possession.

68.     Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and members of the Classes were damaged by the same wrongful conduct of Defendants.

69.     Plaintiff will fairly and adequately protect and represent the interests of members of the Classes. The interests of the Plaintiff are coincident with, and not antagonistic to, those of members of the Classes.

70.     Plaintiff is represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation, including class actions involving group boycotts and conspiracy claims.

71.     Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Classes as a whole appropriate. Questions of law and fact common to members of the Classes include, but are not limited to:

      a.   whether Defendants conspired to unreasonably restrain trade in violation of federal antitrust laws;

      b.   the duration of the alleged conspiracy;

      c.   whether Crop Input retailers conspired amongst themselves and/or joined the conspiracy to unreasonably restrain trade in violation of antitrust laws;

      d.   injury suffered by Plaintiff and members of the Classes;

      e.   damages suffered by Plaintiff and members of the Classes; and

16

f.   whether Defendants have acted or refused to act on grounds generally applicable to members of the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Classes as a whole.

72.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

73.   The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

74.   Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

75.   Plaintiff has defined members of the Classes based on currently available information and hereby reserves the right to amend the definition of members of the Classes, including, without limitation, the Class Period.

## STANDING TO SEEK RELIEF

76.   The members of the Classes have purchased directly from a participant in the conspiracy in restraint of trade between the Manufacturer and Wholesaler Defendants and their Retailer Defendant co-conspirators, or from an authorized retailer that is in the control of the Manufacturer and Wholesaler Defendants by virtue of the terms of the authorized-retailer licenses dictated by the Manufacturer Defendants. As a consequence, the members of the Classes have

17

standing to pursue damages inflicted by the conspiracies under Article III of the United States Constitution and Section 4(a) of the Clayton Act, 15 U.S.C. §15(a).

77.     By engaging in the conspiracy alleged in this Complaint, the Manufacturer Defendants, Wholesaler Defendants, and Retailer Defendants have kept a market structure in place that benefits each of them at the expense of farmers. As the first purchasers injured by the Defendants' anticompetitive conduct, Plaintiff and the members of the Classes have standing as direct purchasers under Section 4(a) of the Clayton Act, 15 U.S.C. §15(a).

78.     The members of the Classes also have standing to seek injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, because the conspiracies have inflicted or threatened to inflict harm on them, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Classes as a whole.

79.     The members of the Classes also have standing to seek declaratory relief under 28 U.S.C. §§2201 and 2202 because there is an actual, present, and justiciable controversy that has arisen between members of the Classes and all Defendants concerning whether Defendants and other co-conspirators have conspired in restraint of trade.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

80.     Any applicable statute of limitations for Plaintiff and the Classes has been tolled and/or Defendants are equitably estopped from asserting a statute of limitations defense by reason of Defendants' and their co-conspirators concealment of the conspiracy.

81.     Group boycotts and other antitrust violations are inherently self-concealing, and Plaintiff and the Classes could not have uncovered the conspiracy earlier using reasonable diligence.

82.     Plaintiff and the Classes were not placed on notice of the conspiracy alleged herein until the Canadian Competition Bureau launched its inquiry and issued its subpoenas.

## CLAIMS FOR RELIEF

## Count 1: Conspiracy to Restrain Trade
## in Violation of § 1 of the Sherman Act (15 U.S.C. § 1)

83.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

84.     During the Class Period, Defendants entered into and engaged in a horizontal combination or conspiracy in restraint of trade to (1) artificially raise, fix, maintain, and/or stabilize prices for Crop Inputs that Defendants sold to Plaintiff and members of the Classes, and (2) jointly boycott entities that would have introduced price-reducing electronic purchasing of Crop Inputs in the United States.

85.     Defendants' actions were not mere parallel conduct but took place in the context of multiple plus factors that typically evince a conspiratorial agreement.

86.     First, the conspiracy was feasible because the market for Crop Inputs is highly concentrated. BASF, Corteva Inc., Syngenta Corporation, and Bayer AG dominate production in virtually every Crop Input category because they hold the patents for the genetic traits and crop protection chemicals that work best with popular branded seeds. As a result, they control 85% of the corn seed market, more than 75% of the soybean seed market, and over 90% of the cotton seed market. The wholesale market is just as concentrated, with seven wholesalers accounting for 70% of all sales volume.

87.     Second, such an effective boycott of electronic platforms would not have been feasible absent actual coordination and cooperation between Defendants. The boycott would only

work if each Manufacturer Defendant agreed to the plan; otherwise, the Manufacturer Defendant that broke from the boycott could have established itself as the primary supplier to electronic platforms and grown its customer base by operating a new distribution channel for its Crop Inputs, taking market share from its rival manufacturers.

88.     Third, Defendants had a strong motive to conspire to preserve the present, opaque market structure. If electronic platforms publicly published price lists for specific Crop Inputs, then the Manufacturer, Wholesaler, and Retailer Defendants could no longer keep prices confidential and charge widely varying prices for the same Crop Input based on geography, and/or maintain price opacity through seed relabeling and bundling. The Retailer Defendants and Wholesaler Defendants were therefore motivated to conspire amongst themselves and exert pressure on the Manufacturer Defendants to protect their profits without having to compete on the merits of price and services.

89.     Fourth, Defendants formed and maintained their conspiracy using a high degree of inter-firm communication both directly and through wholesalers and retailers. For example, CropLife's Board of Directors meets annually to discuss developments in the Crop Input market and has specifically discussed the entry of electronic platforms. Because no representatives from farmers are allowed to participate, these meetings provided a forum for collusion.

90.     As noted above, CropLife's PACE Advisory Council meets annually to discuss issues affecting the Crop Input market. And the Agricultural Retailers Association ("ARA") hosts an annual in-person industry conference every year, which is attended by representatives from all major Crop Input retailers, as well as representatives from each Defendant. These industry conferences provided ample opportunity for Defendants to not only agree amongst themselves how to block electronic platforms from emerging, but also to coordinate with the other levels of

the distribution chain—in fact, as noted above, the threat posed by FBN was the primary discussion topic at the PACE Advisory Council's 2017 annual meeting.

91.     Fifth, Defendants' actions were against their apparent economic self-interest. Providing Crop Inputs to electronic platforms presented a significant business opportunity because those platforms (1) represented well-financed customers ready to purchase Crop Inputs in bulk quantity from a Manufacturer or Wholesaler Defendant; (2) would simplify the distribution channel and permit Manufacturer Defendants to retain more profit by eliminating the need for transport costs, rebates, and incentive programs to wholesalers and retailers; and (3) presented an opportunity for an individual Manufacturer Defendant to increase profits by growing its market share through sales to farmers nationwide, not merely where its authorized retailers were located or enjoyed the largest market share within a specific geographic area.

92.     Sixth, Defendants are antitrust recidivists, which is probative of future collusion. *See*, *e.g.*, *In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498, 500-01 (S.D.N.Y. 2004). Competition experts have noted that past experience with participating in cartels enables companies to spot opportunities to profitably engage in anticompetitive conduct while evading detection. Competition Policy International maintains a list of the "fifty-two leading recidivists." BASF and Bayer are among the top 5 leading antitrust recidivists, and Corteva is also on the list.

93.     This conspiracy was a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

94.     Alternatively, this conspiracy was a "quick look" or rule of reason violation of Section 1 of the Sherman Antitrust Act. There is no legitimate business justification for, or pro-competitive benefits attributable to, Defendants' conspiracy and overt acts in furtherance thereof. Any proffered business justification or asserted pro-competitive benefits would be pretextual,

outweighed by the anticompetitive effects of Defendants' conduct, and, in any event, could be achieved by means less restrictive than the conspiracy and overt acts alleged herein.

95.     Plaintiff and members of the Classes directly purchased Crop Inputs from Defendants and their co-conspirators at supracompetitive prices, suffering antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and overt acts in furtherance thereof.

96.     Plaintiff and members of the Classes have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

97.     Plaintiff and members of the Classes are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

## Count 2: Arizona Uniform State Antitrust Act

98.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

99.     Defendants' acts and practices detailed above violate the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 44-1402, and monopolization or attempted monopolization of trade or commerce for the purpose of excluding competition or controlling, fixing or maintaining prices, *id.* § 44-1403.

100.     Defendants' conduct and practices have substantial anticompetitive effects in Arizona, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

101.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Arizona Uniform State Antitrust Act was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 3: California Cartwright Act

102.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

103.    Defendants' acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See id.* §§ 16720, 16726.

104.    Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

105.    Defendants' conduct and practices have substantial anticompetitive effects, including increased prices and costs, reduced innovation, poorer customer service and lowered output.

106.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 4: Hawaii Antitrust Laws

107.   Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

108.   Defendants' acts and practices detailed above violate Hawaii's antitrust laws, Haw. Rev. Stat. § 480-1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 480-4, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 480-9.

109.   Defendants' conduct and practices have substantial anticompetitive effects in Hawaii, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

110.   Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that Hawaii's antitrust laws were intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 5: Illinois Antitrust Act

111.   Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

112.   Defendants' acts and practices detailed above violate the Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*, which prohibits, *inter alia*, combinations and conspiracies for the purpose or with the effect of fixing, controlling, or maintaining the price or rate charged for any commodity, *id.* 10/3(1)(a), and monopolization or attempted monopolization over any substantial part of trade

24

or commerce for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce, *id.* 10/3(3).

113.    Defendants' conduct and practices have substantial anti-competitive effects in Illinois, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

114.    Plaintiff was harmed by Defendants' anti-competitive conduct in a manner that the Illinois Antitrust Act was intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 6: Iowa Competition Law

115.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

116.    Defendants' acts and practices detailed above violate the Iowa Competition Law, Iowa Code § 553.1, *et seq.*, which prohibits, *inter alia*, combinations to restrain or monopolize trade or commerce, *id.* § 553.4, and the monopolization or attempted monopolization of a market for the purpose of excluding competition or of controlling, fixing, or maintaining prices, *id.* § 553.5.

117.    Defendants' conduct and practices have substantial anticompetitive effects in Iowa, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

118.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Iowa Competition Law was intended to prevent when she paid more for Crop Inputs than she

would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 7: Kansas Restraint of Trade Act

119.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

120.     Defendants' acts and practices detailed above violate the Kansas Restraint of Trade Act, Kan. Stat. § 50-101, *et seq.*, which prohibits, *inter alia*, combinations to create or carry out restrictions in trade or commerce, increase the price of merchandise, or prevent competition in the sale of merchandise, *id.*

121.     Defendants' conduct and practices have substantial anticompetitive effects in Kansas, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

122.     Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Kansas Restraint of Trade Act was intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 8: Maine Monopoly & Profiteering Laws

123.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

124.     Defendants' acts and practices detailed above violate Maine's monopoly and profiteering laws, Me. Rev. Stat. tit. 10, § 1101, *et seq.*, which prohibit, *inter alia*, combinations

in restraint of trade or commerce, *id.*, and the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 1102.

125.    Defendants' conduct and practices have substantial anticompetitive effects in Maine, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

126.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that Maine's monopoly and profiteering laws were intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 9: Maryland Antitrust Laws

127.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

128.    Defendants' acts and practices detailed above violate Maryland's antitrust laws, Md. Code, Com. Law § 11-201, *et seq.*, which prohibit, *inter alia*, combinations that unreasonably restrain trade or commerce, *id.* § 11-204, and the monopolization or attempted monopolization of any part of the trade or commerce for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce, *id.*

129.    Defendants' conduct and practices have substantial anticompetitive effects in Maryland, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

130.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Maryland antitrust laws were intended to prevent when she paid more for Crop Inputs than she

would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 10: Massachusetts Consumer Protection Laws

131.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

132.    Defendants' acts and practices detailed above violate Massachusetts' consumer protection laws, Mass. Gen. Laws ch. 93A, § 1, *et seq.*, which prohibit, *inter alia*, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, *id.* § 2.

133.    Defendants' conduct and practices have substantial anticompetitive effects in Massachusetts, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

134.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Massachusetts consumer protection laws were intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 11: Michigan Antitrust Reform Act

135.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

136.    Defendants' acts and practices detailed above violate the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, *et seq.*, which prohibits, *inter alia*, combinations in

28

restraint of, or to monopolize, trade or commerce, *id.* § 445.772, and the establishment or attempted establishment of a monopoly of trade or commerce for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, *id.* § 445.773.

137.    Defendants' conduct and practices have substantial anticompetitive effects in Michigan, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

138.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Michigan Antitrust Reform Act was intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 12: Minnesota Antitrust Law of 1971

139.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

140.    Defendants' acts and practices detailed above violate the Minnesota Antitrust Law of 1971, Minn. Stat. § 325D.49, *et seq.*, which prohibits, *inter alia*, combinations in unreasonable restraint of trade or commerce, *id.* § 325D.51, and the establishment or attempted establishment of a monopoly over any part of trade or commerce for the purpose of affecting competition or controlling, fixing, or maintaining prices, *id.* § 325D.52.

141.    Defendants' conduct and practices have substantial anticompetitive effects in Minnesota, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

142.     Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Minnesota Antitrust Law of 1971 was intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

### Count 13: Mississippi Antitrust Laws

143.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

144.     Defendants' acts and practices detailed above violate Mississippi's antitrust laws, Miss. Code. § 75-21-1, *et seq.*, which prohibit, *inter alia*, combinations inimical to the public welfare that restrain trade, increase the price of a commodity, or reduce the production of a commodity, *id.*

145.     Defendants' conduct and practices have substantial anticompetitive effects in Mississippi, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

146.     Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that Mississippi's antitrust laws were intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

### Count 14: Nebraska Junkin Act

147.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

148.    Defendants' acts and practices detailed above violate the Junkin Act, Neb. Rev. Stat. § 59-802, *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce, *id.* § 59-802, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 16726.

149.    Defendants' conduct and practices have substantial anticompetitive effects in Nebraska, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

150.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that Nebraska's Junkin Act was intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 15: Nevada Unfair Trade Practices Act

151.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

152.    Defendants' acts and practices detailed above violate the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010, *et seq.*, which prohibits, *inter alia*, the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 598A.060, and tying arrangements, consisting of contracts in which the seller or lessor conditions the sale or lease of commodities or services on the purchase or leasing of another commodity or service, *id.*

153.    Defendants' conduct and practices have substantial anticompetitive effects in Nevada, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

31

154.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that Nevada's Unfair Trade Practices Act was intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 16: New Hampshire Consumer Protection Act

155.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

156.    Defendants' acts and practices detailed above violate the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*, which prohibits, *inter alia*, the pricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition, *id.* § 358-A:2.

157.    Defendants' conduct and practices have substantial anticompetitive effects in New Hampshire, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

158.    Plaintiff was harmed by Defendants' anti-competitive conduct in a manner that the New Hampshire Consumer Protection Act was intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 17: New Mexico Antitrust Act

159.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

160.    Defendants' acts and practices detailed above violate the New Mexico Antitrust Act, N.M. Stat. § 57-1-1, *et seq.*, which prohibits, *inter alia*, the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 57-1-2, and combinations in restraint of trade or commerce, *id.* § 57-1-1.

161.    Defendants' conduct and practices have substantial anticompetitive effects in New Mexico, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

162.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the New Mexico Antitrust Act was intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

### Count 18: New York Donnelly Act

163.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

164.    Defendants' acts and practices detailed above violate New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*, which prohibits, *inter alia*, monopoly in the conduct of any business, trade or commerce or in the furnishing of any service, *id.* § 340.

165.    Defendants' conduct and practices have substantial anticompetitive effects in New York, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

166.    Plaintiff was harmed by Defendants' anti-competitive conduct in a manner that New York's Donnelly Act was intended to prevent when she paid more for Crop Inputs than she

33

would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

### Count 19: North Carolina Antitrust Laws

167.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

168.    Defendants' acts and practices detailed above violate North Carolina's antitrust laws, N.C. Gen. Stat. § 75-1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 75-1, and the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 75-2.1

169.    Defendants' conduct and practices have substantial anticompetitive effects in North Carolina, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

170.    Plaintiff was harmed by Defendants' anti-competitive conduct in a manner that the North Carolina antitrust laws were intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

### Count 20: North Dakota Uniform State Antitrust Act

171.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

172.    Defendants' acts and practices detailed above violate the North Dakota Uniform State Antitrust Act, N.D. Cent. Code § 51-08.1-01, *et seq.*, which prohibits, *inter alia*,

combinations in restraint of, or to monopolize, trade or commerce, *id.* § 51-08.1-02, and the establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding competition or controlling, fixing, or maintaining prices, *id.* § 51-08.1-03.

173.    Defendants' conduct and practices have substantial anticompetitive effects in North Dakota, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

174.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the North Dakota Uniform State Antitrust Act was intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 21: Oregon Antitrust Law

175.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

176.    Defendants' acts and practices detailed above violate the Oregon Antitrust Law, Or. Rev. Stat. § 646.705, *et seq.*, which prohibits, *inter alia*, combinations in restraint of trade or commerce, *id.* § 646.725, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 646.730.

177.    Defendants' conduct and practices have substantial anticompetitive effects in Oregon, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

178.    Plaintiff was harmed by Defendants' anti-competitive conduct in a manner that the Oregon Antitrust Law was intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 22: South Dakota Antitrust Laws

179.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

180.    Defendants' acts and practices detailed above violate South Dakota's antitrust laws, S.D. Codified Laws § 37-1-3.1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.*, and monopolization or attempted monopolization of trade or commerce, *id.* § 37-1-3.2.

181.    Defendants' conduct and practices have substantial anticompetitive effects in South Dakota, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

182.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that South Dakota's antitrust laws were intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 23: Tennessee Trade Practices Act

183.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

36

184.    Defendants' acts and practices detailed above violate the Tennessee Trade Practices Act, Tenn. Code § 47-25-101, *et seq.*, which prohibits, *inter alia*, combinations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, *id.*

185.    Defendants' conduct and practices have substantial anticompetitive effect in Tennessee, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

186.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Tennessee Trade Practices Act was intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 24: Utah Antitrust Act

187.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

188.    Defendants' acts and practices detailed above violate the Utah Antitrust Act, Utah Code § 76-10-3101, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 76-10-3104, and monopolization or attempted monopolization of any part of trade or commerce, *id.*

189.    Defendants' conduct and practices have substantial anticompetitive effect in Utah, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

190.    Plaintiff was harmed by Defendants' anti-competitive conduct in a manner that the Utah Antitrust Act was intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 25: Vermont Consumer Protection Laws

191.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

192.    Defendants' acts and practices detailed above violate Vermont's consumer protection laws, Vt. Stat. tit. 9, § 2451, *et seq.*, which prohibit, *inter alia*, all unfair methods of competition in commerce, *id.* § 2453.

193.    Defendants' conduct and practices have substantial anticompetitive effects in Vermont, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

194.    Plaintiff was harmed by Defendants' anti-competitive conduct in a manner that the Vermont consumer protection laws were intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 26: Wisconsin Trade Regulations

195.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

196.    Defendants' acts and practices detailed above violate Wisconsin's trade regulations, Wis. Stat. Ann. § 133.01, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 133.03, and monopolization or attempted monopolization of any part of trade or commerce, *id.*

197.    Defendants' conduct and practices have substantial effects in Wisconsin, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

198.    Plaintiff was harmed by Defendants' anti-competitive conduct in a manner that Wisconsin's trade regulations were intended to prevent when she paid more for Crop Inputs than she would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## **PRAYER FOR RELIEF**

Plaintiff demands relief as follows:

A.    That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representative, and that Plaintiff's counsel be appointed as Class counsel;

B.    That the unlawful conduct alleged herein be adjudged and decreed to violate § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and §10/1 of the Illinois Antitrust Act;

C.    That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint under § 16 of the Clayton Antitrust Act, 16 U.S.C. § 26;

D.      That the Court award Plaintiff and the Class damages against Defendants for their violation of federal and state antitrust laws, in an amount to be trebled under § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

E.      That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

F.      That the Court award Plaintiff and the Class prejudgment interest at the maximum rate allowable by law; and

G.      That the Court direct such further relief as it may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: January 8, 2021

/s/ George A. Zelcs
Stephen M. Tillery (Ill. Bar No. 2834995)
Jamie Boyer (Ill. Bar No. 6281611)
Carol O'Keefe (Ill. Bar No. 6335218)
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: 314-241-4844
Facsimile: 314-241-3525
stillery@koreintillery.com
jboyer@koreintillery.com
cokeefe@koreintillery.com

George A. Zelcs (Ill. Bar No. 3123738)
John Libra (Ill. Bar No. 6286721)
Randall P. Ewing, Jr. (Ill. Bar No. 6294238)
Jonathon Byrer (Ill. Bar No. 6292491)
Ryan Z. Cortazar (Ill. Bar No. 6323766)
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com
jlibra@koreintillery.com
rewing@koreintillery.com
jbyrer@koreintillery.com
rcortazar@koreintillery.com

LOWEY DANNENBERG P.C.

/s/ Vincent Briganti
Vincent Briganti (*pro hac vice* forthcoming)
Christian Levis (*pro hac vice* forthcoming)
Roland R. St. Louis, III (*pro hac vice* forthcoming)
44 South Broadway
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
rstlouis@lowey.com

*Counsel for Plaintiff*

41